David D. DALY, M.D., Ph.D.,
Plaintiff-Appellant,

v.

Charles C. SPRAGUE, M.D., et al.,
Defendants-Appellees.

No. 81–1237.

United States Court of Appeals,
Fifth Circuit.

May 14, 1982.
Rehearing Denied Aug. 25, 1982.

---

Winikates & Curtis, Charles J. Winikates, Dallas, Tex., for plaintiff-appellant.

Laura S. Martin, Asst. Atty. Gen., Austin, Tex., for defendants-appellees.

Before THORNBERRY, REAVLEY and RANDALL, Circuit Judges.

RANDALL, Circuit Judge:

Plaintiff, David Daly, M.D., appeals from summary judgment granted in favor of Charles C. Sprague, M.D., Frederick Bonte, M.D., Roger N. Rosenberg, M.D., the Board of Regents of the University of Texas and Regents Howard Richards, Dan Williams, Jon Newton, James Powell, Thomas Law, Walter Sterling, Jess Hay, Jane Blumberg and Sterling Fly (collectively the "Defendants"). Daly had brought suit pursuant to 42 U.S.C. §§ 1983, 1985 and 1986 alleging that removal of his clinical privileges as a faculty member of Southwestern Medical School violated his first amendment rights to freedom of speech and association and his fourteenth amendment rights to procedural due process and equal protection under the law. Jurisdiction was predicated on 28 U.S.C. §§ 1331 and 1343. The district court entered summary judgment for the Defendants, finding that Daly had failed to state any claim upon which relief could be granted. We hold that the granting of summary judgment as to Daly's claim of infringement of his first amendment rights was improper because the district court wholly failed to consider this claim. As a matter of law we remand the case for consideration of this issue.

## I. FACTUAL AND PROCEDURAL BACKGROUND

David Daly was at the time of the incident giving rise to this action a tenured professor in the Department of Neurology (the "Department"), at the Southwestern School of Medicine (the "Medical School"), a component of the University of Texas Health Sciences Center (the "Center"), which is a branch of the University of Texas System. His duties included giving lectures to medical students, interns, and residents at the Medical School and consulting with and treating neurological patients at the Center.

Defendant Roger M. Rosenberg, Chairman of the Department, was Daly's immediate supervisor at the Medical School. Defendant Charles C. Sprague was President of the Medical School; defendant Frederick J. Bonte was Dean of the Medical School;

original defendant Michael Blaw was Vice-Chairman of the Department.[1]

In June, 1979 Daly's wife became ill. On June 18, 1979, Daly informed Sprague of his wife's illness and the need for Daly to care for her. On June 22 he informed Sprague's secretary that it was necessary that he absent himself from his hospital duties to be with his wife who was to be hospitalized in another city.

During that same period of time Bonte attempted to schedule a meeting with Daly to discuss his duties as a faculty member. Daly, because of his wife's illness, cancelled several appointments. Daly and Bonte finally met on June 29. Bonte informed Daly that Daly's clinical privileges as a faculty member had been removed by Rosenberg on June 26, 1979, a decision in which Sprague and Bonte concurred. Bonte informed Daly that this decision had been communicated to Daly in a June 26 letter[2] from Rosenberg (which Daly had not yet received). Bonte and Daly did not discuss the exact implications of the removal of the clinical privileges;[3] Bonte referred Daly to Rosenberg. Daly then immediately went to Rosenberg, requested and received a leave of absence (from June 29, 1979 to July 10, 1979). Daly, however, failed to discuss reasons for removal of his clinical privileges with Rosenberg.

Daly returned from leave on July 10. On that date and again on July 16, he wrote Rosenberg concerning the removal of his clinical privileges, stating in the July 10th letter:

Your letter of 26 June causes me great anguish. Removal of clinical privileges without specific charges, investigation and hearing has impugned my good name and may seriously impair my ability to care for my patients. Please provide me with copies of the University of Texas regulations relating to clinical privileges, removal, etc. I believe I have been deprived of due process.

and in the July 16th letter:

At no time recently have you discussed with me or expressed any concern to me about my professional activities. Your only written communication to me has been your letter dated June 26, removing my clinical privileges; that instrument contained neither explanation nor justification for that extreme act. In the meeting of June 29, Dean Bonte indicated that he was aware of the contents of your letter but declined to discuss them and indicated that he saw no reason for future meetings between him and me. When I returned from leave on July 10 and read your letter, your unavailability left no recourse but to meet with Presi-

---

1. Blaw was dismissed as a defendant by the district court with Daly's concurrence at the hearing on motion for summary judgment.

2. The letter states in pertinent part:

    After discussing in some detail with Dr. Bonte and Dr. Sprague, the matter of the quality of your professional activities and personal conduct in the recent past, and in view of your recent phone call to Dr. Sprague indicating the uncertainty of your continued full-time presence, it is my responsibility to inform you that as of today your clinical privileges as a faculty member in this department have been removed. Dr. Bonte and I have discussed the numerous areas of concern that I have had about your overall performance here and he has attempted on several occasions to meet with you to discuss these issues. You have not kept any of these appointments with Dr. Bonte and thus you leave us no course but to take this action.

3. Whether the removal of the clinical privileges affected Daly's ability to see current patients or only new patients at the Center is unclear from the deposition testimony of the parties. Daly alleged that his clinical privileges to see new patients were removed and that he was told not to consult with current patients. Daly does not allege he was foreclosed from private practice. The Defendants maintain he was only removed from the list of faculty members who saw new patients at the Center and that his right to see current patients or engage in private practice was not impaired. They do not remember telling him not to communicate with current patients. Any distinction as to which patients he could or could not see is not, however, a determining factor in our decision as we hold Daly had not established the existence of a protected interest in his clinical privileges to see current or new patients. See part IV, *infra*.

dent Sprague for interpretation of this action. President Sprague indicated that I was a University employee and thus prohibited from communicating with any patients.

At some time after July 10th, Daly spoke to Sprague concerning the loss of privileges and, according to Daly, Sprague told him not to communicate with any of his patients. Daly has alleged that during the week of July 11–17, 1979, as a result of Sprague's ultimatum, he was forced to cancel a consultation with an out-of-town physician concerning a seriously ill patient in Dallas and that he could not communicate with at least two other patients.

On July 17, 1979, Rosenberg replied to Daly's letters:

I returned yesterday from a week-long trip out of town and read for the first time your letters dated July 10 and July 16, 1979. I can appreciate your concern in having your clinical privileges as a faculty member in this department being removed. This was a proper step which had to be taken by Dr. Bonte and myself because of your unavailability and inability to function for an uncertain period. You indicate in your two letters that you are now prepared to return to full-time clinical and academic activities and therefore with the concurrence of President Sprague, I return to you your full clinical and professional privileges as a faculty member in this medical school.

Daly's clinical privileges were restored on July 17, 1979.

On August 31, 1979, Daly filed suit in the District Court for the Northern District of Texas alleging that the Defendants had, in the removal of his clinical privileges, deprived him of liberty and property without due process in violation of the fourteenth amendment and had, through Sprague's order forbidding communication with patients, violated Daly's first amendment rights to freedom of speech and association.

Daly's inclusion in his suit of the members of the University of Texas Board of Regents (the "Regents") was based on the allegation that they failed to "direct govern and operate the University of Texas Health Science Center at Dallas in a manner conforming to law . . . ."

The suit languished for nearly a year. Efforts at settlement failed. On August 27, 1980, the Defendants filed a Motion To Dismiss Or For Summary Judgment (hereinafter "Motion for Summary Judgment"). Daly's counsel then withdrew; and Daly hired new counsel who requested additional time for discovery. The motion for additional time was granted. Daly on December 5, 1980, requested discovery relating to events occurring after the suit was filed. That motion was denied by a magistrate on December 8, 1980, and affirmed by the district court on January 5, 1981. Discovery was once again extended and finally completed on January 20, 1981. Trial was set for February 9, 1981. On January 20, 1981, Daly attempted to amend his complaint; the motion to amend was denied.[4] Defendants then amended and reurged their Motion for Summary Judgment, claiming that Daly had failed to allege facts sufficient to show a cause of action; they specifically asserted that Daly alleged no property interest of which he had been deprived, that he had not shown deprivation of a liberty interest, that there had been no damage to reputation, that he had failed to demonstrate that he had been forced to abandon any patients, that the University of Texas Board of Regents collectively and individually were not liable in this § 1983 action and that any complaint for damages was barred as to the Defendants by the eleventh amendment because Texas, rather than the individual defendants, was the real party in interest.

---

4. The denial of the motion to amend stated:
 Came on for consideration the plaintiff's motion for leave to amend. Considering that this case is set for trial on February 9, 1981, and that the matter urged in the amended complaint could have been raised at an earlier time, the court is of the opinion that the motion should be denied.

The district court, after a hearing on February 9, 1981, granted the Motion For Summary Judgment[5] finding that

The undisputed facts show ... on June 26, 1979, [Daly] was informed by letter that his clinical privileges had been suspended.[6] On July 17, 1979, his clinical privileges were fully restored at his request. It also is undisputed that plaintiff did not suffer any loss of income or status as a result of his suspension, nor were his teaching privileges or his research privileges effected. Further, it is without dispute that [Daly] left town on June 22, 1979, and on June 29, 1979, while out of town and prior to receiving the letter suspending his privileges, he sought a leave of absence until July 11, 1979. Additionally, defendants did not communicate the suspension of plaintiff's clinical privileges to anyone but plaintiff, although plaintiff did tell other people of his suspension.

From this factual basis the district court concluded that "[n]one of the allegations of plaintiff's complaints are factually supported so as to state a claim for relief under §§ 1983, 1985 or 1986 and, thus are not able to survive the defendant's motion."[7]

The district court amplified its conclusion by reciting several of Daly's allegations and then ruling on each. According to the court, one loss alleged by Daly, the loss of his right and ability to treat patients, did not result in any cognizable injury. The court stated:

Although there is a factual dispute as to whether the suspension meant that the plaintiff could not treat any patients, old and new, or only that he would not be assigned any new patients, plaintiff has alleged only one instance where there could have been any possible interference with the doctor—client relationship.... In addition, since he was voluntarily absent during a substantial part of the suspension period any interference with his relationship with his patients was as much a result of his own actions as any actions of the defendants. Thus, he had no liberty or property interest that was harmed by the defendants.

The court found that the Defendants had not communicated Daly's suspension to anyone, and that even if they had, "since plaintiff retains his position, even if defendants' actions did defame him plaintiff's claim that his reputation was damaged does not give rise to a loss of a protected interest."

Further, the court held that "[a]lthough a suspension of clinical privileges may under some circumstances be so onerous as to constitute a 'loss of employment,' the facts of the instant case do not rise to such a level." The court found that the plaintiff's voluntary leave had reduced his suspension to less than a week, and that, even if the suspension had been for 22 days, it did not rise to the level of loss of employment. The court concluded that "plaintiff has failed to assert a property interest that was injured by his suspension."

Finally, the court found that Daly had "not shown that he was entitled to a name-clearing hearing ... [or that] state law gave him a right to any sort of procedural process before suspension, or that he had a constitutional right to any procedural due process prior to his suspension." The court also found all other unspecified claims insubstantial.

---

**5.** The district court correctly stated that because the case had progressed into discovery the Motion to Dismiss was treated as a motion for summary judgment and that affidavits and depositions were considered along with pleadings. *See Northeast Georgia Radiological Associates, P. C. v. Tidwell*, 670 F.2d 507, 510 n.7 (5th Cir. 1981).

**6.** Daly argues that his privileges were removed rather than suspended. We agree. Whether the privileges were removed rather than suspended is not, however, determinative in this case. See part IV, *infra*.

**7.** The court also held that the Regents could not be subjected to liability.

[S]ince there are no allegations that these defendants either took part in the decisions which are alleged to have violated plaintiff's rights, or that they in any way knew of the decisions the motion to dismiss is granted. See part VI, *infra*.

The court, in a footnote, also noted, without deciding, that plaintiff's claim against the defendants "appears to be against them only in their official capacity, and would, therefore be barred under the Eleventh Amendment at least as to the damage portion of his claim."

Daly appealed, alleging that the district court erred in: its finding that Daly's claims of harm were insubstantial, its holding that the Regents were not subject to liability, its ruling that Daly had failed to factually support his claims, its denial of his motion for discovery of events occurring after the date of filing, its denial of his Motion to Amend Complaint, its notation that Plaintiff's claim is barred by the eleventh amendment, and its conducting a hearing on the Defendants' Amended Motion for Summary Judgment less than ten days after the filing of the Amended Motion.

We address each of Daly's arguments.

## II. WHAT THIS CASE IS NOT ABOUT

█ To a great extent Daly based his claims in his appellate brief and at oral argument on the premise that the Defendants had removed his clinical privileges because he challenged accounting practices of the Medical School, specifically those relating to one fund into which patient revenue was placed.[8] He asserts this action violates his first amendment right to freedom of speech. *See Mt. Healthy City Board of Education v. Doyle*, 429 U.S. 274, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977). The district court did not address this claim. This is not surprising, considering that Daly did not include this claim in his Original or Amended Complaint or his Pretrial Order. The only possible reference to the allegations asserted now on appeal are several statements in Daly's briefs that "the inference is strong that Daly's questioning of Rosenberg's accounting was a factor in Rosenberg's mistreatment of Daly." Most importantly, when Daly, shortly before trial, attempted to amend his complaint, he wholly failed to include *any* reference to this *Mt. Healthy* claim. Daly's almost casual statements in his briefs, absent allegations in the pleadings and specific legal argument in the briefs, do not constitute a sufficient presentation to the district court of the claim Daly now attempts to assert before this court. This claim, not raised to the district court, will not be addressed when presented for the first time at the appellate level. *West India Industries, Inc. v. Tradex, Tradex Petroleum Services*, 664 F.2d 946, 951 (5th Cir. 1981) ("The very nature of an appellate system precludes litigants from raising issues for the first time on appeal."). Because there is no indication of manifest injustice here, "we do not consider [this] afterthought first raised on appeal." *Id.*

## III. DENIAL OF AMENDMENT OF COMPLAINT AND EXPANDED DISCOVERY

Daly alleges that his Motion to Amend Complaint, made on January 20, 1981,

---

**8.** Income from patients treated by faculty members went into a fund, identified as the Medical Service Research, Development and Planning fund, (MSRDP), maintained by the Department. The fund was used to supplement the legislative funding of individual salaries and to provide benefits such as travel expenses and insurance premiums. Payments for patient treatment by faculty members were deposited into the MSRDP fund rather than being received by individual faculty members; records were maintained by the Department to show the revenues credited to each physician. Dr. Rosenberg was in charge of the MSRDP fund of the Department and was primarily responsible for its accounting.

In October, 1978, Rosenberg wrote to Daly, enclosing a summary statement of MSRDP private patient income generated by Daly from 1974–78 and suggesting that Daly examine income generated from private patients in order to maintain "faculty and fringe support." The summary statement indicated the following:

#### MSRDP Income Generated

| 1977–1978 | 1976–1977 | 1975–1976 | 1974–1975 |
|-----------|-----------|-----------|-----------|
| $1,413 | $1,720 | $3,602 | $4,015 |

In February, 1979, Robert Heins, Director of MSRDP informed Daly that, for the calendar year 1978, he had deposited $5,061.28 into the MSRDP fund.

On June 12, 1979, Daly wrote Rosenberg, stating that the summary statement MSRDP income of $1,413 was "in conflict" with the accounting provided by the Director of MSRDP showing deposits to the fund of $5,061.28. He requested that an accounting be conducted and that the alleged conflict be resolved.

should not have been denied by the district court and that he should have been allowed discovery of events occurring after the suit was filed in August 31, 1979. We address these questions first, for if the denials of the Motion to Amend and for discovery were erroneous, the additional pleading and possible discovery may have had a bearing on the court's granting of the Motion for Summary Judgment. If nothing else, the additional information might have provided additional relevant material to be evaluated in the court's consideration of the Motion for Summary Judgment which would affect our ability to review its decision.

■ Our standard of review of the court's denial of the Motion to Amend Complaint is whether the district court abused its discretion in the denial. *Barrett v. Independent Order of Foresters*, 625 F.2d 73, 75 (5th Cir. 1980). In the present action, the proposed amendment restated allegations presented in the original complaint and sought to add new allegations of accounting discrepancies in the Medical School's records concerning income generated by Daly from private patients at the medical school. While Daly alleges that his amended complaint and the alleged income discrepancies would show a "continuing and concerted effort by the Defendants to destroy Plaintiff's [Daly's] professional standing ..." and to force his resignation, this allegation does not add substance to his previous allegations of violation of his first and fourteenth amendment rights resulting from removal of his clinical privileges. Daly's allegations of a scheme, not yet brought to fruition, to force his resignation do not give rise to a *deprivation* of a protected interest nor did he allege that his complaints about accounting irregularities led to removal of the clinical privileges.

■ As the court said in *Barrett*:

The decision whether to grant such a motion, however, is entrusted to the discretion of the trial court. *In re Westec*, 434 F.2d 195 (5th Cir. 1970). In the present action the proposed amendment sought to add several new parties and additional counts. Even though the mo-

tion was not filed until nearly ten months after the original complaint, there would appear to be no matters that appellant proposed to add which could not have been raised initially. Given the circumstances, this court cannot say that the trial judge abused his discretion.

*Barrett v. Independent Order of Foresters*, 625 F.2d at 75. We find this logic compelling in the case before us. The court did not abuse its discretion in denying an amended complaint which asserted new allegations not germane to the original action and which was filed sixteen months after the filing of the original complaint.

■ Daly also complains that the district court erred in failing to allow additional discovery of events occurring after the filing of the suit on August 31, 1979. Daly alleges that, since he has asked for injunctive relief against the Medical School's future removal of clinical privileges and future interference with his constitutional rights of speech, he should be able to expand discovery from the date the suit was filed to the present time.

Our standard of review is whether the district court abused its discretion in refusing to permit the discovery. *Id.* Our review of the record indicates that no such abuse occurred. Under the basic rule of discovery that a matter must be "relevant to the subject matter involved in the pending action," Fed.R.Civ.P. 26, Daly has not shown how events between August 31, 1979, and the present are relevant to the past removal of his clinical privileges or to his wholly speculative fears of future removal of these privileges. As the magistrate found:

Plaintiff's pleadings do not contain any representation that any of his privileges or rights have been withdrawn or modified by the Defendants since July 17, 1979. Absent some act or conduct which adversely affects a "property interest" of the Plaintiff, no claim cognizable under the Civil Rights Act is stated. Thus the expectation or fear that at some future date the Defendants may take actions which impinge upon constitutionally pro-

tected "property interests" does not give rise to a cause of action. Of course the present motion is presented in the context of Discovery, and this Court is not called upon to determine the admissibility of information or records pertaining to events subsequent to August 31, 1979. However, the information sought, to wit; acts and conduct of the Defendants occurring after Plaintiff's suspension was terminated on July 17, 1979, and after August 31, 1979 have no bearing whatsoever on whether the Defendants' acts and conduct prior to the Plaintiff's suspension on or about June 26, 1979 were constitutionally permissible or proscribed.

The denial of Daly's requested discovery of events occurring after the filing of the suit was not an abuse of discretion.

## IV. FOURTEENTH AMENDMENT VIOLATIONS

Crucial to the analysis of the propriety of the grant of summary judgment is the determination whether Dr. Daly possessed a liberty or property interest which would bring into play the due process guaranties of the fourteenth amendment. *Goss v. Lopez,* 419 U.S. 565, 95 S.Ct. 729, 42 L.Ed.2d 725 (1975).

The district court, in its analysis[9] of Daly's claims seemed, in some instances to determine that, as a matter of law, Daly had no protected liberty or property interest and in other instances to rule that there were no facts presented which would support the allegations of any deprivation of a protected interest.

We agree with the conclusion of the district court that summary judgment should be granted on the fourteenth amendment claims. We hold that Daly failed to sustain the burden required of him in a motion for summary judgment to demonstrate facts to support his allegation that he had property and liberty interests in the clinical privileges associated with his professorship.

■ We briefly review the standard applicable to the granting of summary judgment.[10]

Fed.R.Civ.P. 56(b) states:

*For Defending Party.* A party against whom a claim, counterclaim, or cross-claim is asserted or a declaratory judgment is sought may, at any time, move with or without supporting affidavits for a summary judgment in his favor as to all or any part thereof.

This is further amplified by Fed.R.Civ.P. 56(c) which provides in pertinent part:

*Motion and Proceedings Thereon.* The motion shall be served at least 10 days before the time fixed for the hearing. The adverse party prior to the day of hearing may serve opposing affidavits. The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. A summary judgment,

---

**9.** See text, pp. 721–722, *supra,* for a detailed review of the district court's findings.

**10.** The Defendants argue that our standard of review of a granting of a summary judgment is whether the court abused its discretion, citing for that proposition *Walters v. City of Ocean Springs,* 626 F.2d 1317 (5th Cir. 1980). Defendants misapprehend *Walters. Walters* involved the review of summary judgment motion where the district court refused to grant a continuance to a nonmoving party to obtain evidence to controvert the motions for summary judgment. The error claimed was in the refusal of the court under Fed.R.Civ.P. 56(f) to grant additional time. The standard of review was whether the district court abused its discretion. *Walters* at 1321. When, however, the question

is whether the granting of the summary judgment was correct, the standard of review is whether there were absolutely no factual disputes and whether the movant was entitled to judgment as a matter of law.

By contrast to the "abuse of discretion" standard we employ for review of the trial court's rulings on rule 56(f) motions, here we look at the record in the light most favorable to the party opposing the motion. *E.g., Poller v. Columbia Broadcasting System, Inc.,* 368 U.S. 464 [82 S.Ct. 486, 7 L.Ed.2d 458] (1962); *O'Boyle Tank Lines, Inc. v. Beckham,* 616 F.2d 207, 209 (5th Cir. 1980).

*Walters v. City of Ocean Springs,* 626 F.2d at 1322.

interlocutory in character, may be rendered on the issue of liability alone although there is a genuine issue as to the amount of damages.

Rule 56(e) further states in pertinent part:

When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of his pleading, but his response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial. If he does not so respond, summary judgment, if appropriate, shall be entered against him.

This procedure has been recently summarized by this court:

Summary judgment should be entered only if "there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). *See Casey Enterprises v. American Hardware Mutual Insurance Co.*, 655 F.2d 598, 601–02 (5th Cir. 1981). In reviewing a decision granting or denying summary judgment, this court applies the same legal standards as those that control the district court in determining whether summary judgment is appropriate. *Environmental Defense Fund v. Marsh*, 651 F.2d 983, 991 (5th Cir. 1981); *United States Steel Corp. v. Darby*, 516 F.2d 961 (5th Cir. 1975).

The party seeking summary judgment bears the exacting burden of demonstrating that there is no actual dispute as to any material fact in the case. *Adickes v. S. H. Kress & Co.*, 398 U.S. 144, 157, 90 S.Ct. 1598, 1608, 26 L.Ed.2d 142 (1970); *Environmental Defense Fund v. Marsh*, 651 F.2d at 990–91. In assessing whether the movant has met this burden, the courts should view the evidence introduced and all factual inferences from that evidence in the light most favorable to the party opposing the motion. *Id.* All reasonable doubts about the facts should be resolved in favor of the non-

moving litigant. *Casey Enterprises v. American Hardware Mutual Insurance Co.*, 655 F.2d at 602. A court must not decide any factual issues it finds in the record, but if such are present, the court must deny the motion and proceed to trial. *Environmental Defense Fund v. Marsh*, 651 F.2d at 991; *Lighting Fixture & Electric Supply Co. v. Continental Insurance Co.*, 420 F.2d 1211, 1213 (5th Cir. 1969). Summary judgment may be inappropriate even where the parties agree on the basic facts, but disagree about the factual inferences that should be drawn from these facts. *Id.* If reasonable minds might differ on the inferences arising from undisputed facts, then the court should deny summary judgment. *Croley v. Matson Navigation Co.*, 434 F.2d 73, 75 (5th Cir. 1970); *Marsden v. Patane*, 380 F.2d 489, 491 (5th Cir. 1967).

Moreover, the party opposing a motion for summary judgment need not respond to it with any affidavits or other evidence unless and until the movant has properly carried its burden. *Adickes v. S. H. Kress & Co.*, 398 U.S. at 160, 90 S.Ct. at 1609–10; *Environmental Defense Fund v. Marsh*, 651 F.2d at 991; *Bernard v. Gulf Oil Co.*, 596 F.2d 1249, 1255 (5th Cir.), *vacated*, 604 F.2d 449 (5th Cir. 1979) (en banc), *adopted in pertinent part on rehearing en banc*, 619 F.2d 459, 463 (5th Cir. 1980), *aff'd on other grounds*, 452 U.S. 89, 101 S.Ct. 2193, 68 L.Ed.2d 693 (1981). The moving party must demonstrate that the facts underlying all the relevant legal questions raised by the pleadings or otherwise are not in dispute, or else summary judgment will be denied notwithstanding that the nonmoving party has introduced no evidence whatsoever. *Brunswick Corp. v. Vineberg*, 370 F.2d 605, 611–12 (5th Cir. 1967). See *Dalke v. Upjohn Co.*, 555 F.2d 245, 248–49 (9th Cir. 1977).

*Impossible Electronic Techniques, Inc. v. Wackenhut Protective Systems, Inc.*, 669 F.2d 1026, 1030–1031 (5th Cir. 1982).

Under the methodology established for our analysis of this Motion for Summary

Judgment, we first examine whether the Defendants have shown that there are no facts in dispute. Here, the Defendants claim, much as they would in a motion to dismiss under Fed.R.Civ.P. 12(b)(6), that there are no facts pleaded by Daly to support the threshold requirement, the existence of a property or liberty interest. The question here is not whether there are facts in dispute which preclude summary judgment, but whether Daly has alleged enough facts to allege a protected interest and avoid summary judgment.

■ A review of the factual allegations [11] in the light most favorable to Daly demonstrate: Daly is a tenured professor at the Medical School; Daly has clinical privileges as a faculty member; his clinical privileges were removed on June 26, 1979; he was on voluntary leave of absence from June 29 to July 11, 1979; his clinical privileges were restored on July 17, 1979; the loss of clinical privileges is a serious matter to a doctor, the reason for which would be questioned in an employment interview; Daly has not attempted to apply for other employment since the removal of his clinical privileges; no official of the medical school communicated the removal of the clinical privileges to any person except Daly; the Rules and Regulations of the Board of Regents of the University of Texas System for the Government of the University of Texas System (PART ONE) (the "Regulations") describe the procedures for termination of a tenured professor [12] but do not address removal of clinical privileges; Daly's tenured employment and salary were not reduced because of the removal of the privileges; Daly was told by Dr. Sprague not to communicate with patients while he had no clinical privileges; and Daly was unable to consult with another physician during the week of July 10–17 because of the removal of his clinical privileges.

The Defendants assert that the facts set forth by Daly fail to establish that he had a property or liberty interest in the clinical privileges. We agree. Notably absent from Daly's pleadings, the depositions filed, briefs and affidavits are any facts from which we can determine that clinical privileges rise to the level of a property or liberty interest.

A property interest has been defined by the Supreme Court:

> To have a property interest in a benefit, a person clearly must have more than an abstract need or desire for it. He must have more than a unilateral expectation of it. He must, instead, have a legitimate claim of entitlement to it.
> . . . .
> Property interests, of course, are not created by the Constitution. Rather they are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law—rules or understandings that secure certain benefits and that support claims of entitlement to those benefits.

11. As previously noted, the district court's decisions to deny the Motion to Amend Complaint and to deny discovery after the suit was brought were proper. We thus examine the pleadings, affidavits and depositions currently on file in our review of this summary judgment.

12. The Regulations state in pertinent part:
6.3 Termination by an institution of the employment of a faculty member who has been granted tenure and of all other faculty members before the expiration of the stated period of their appointment, except by resignation or retirement for age in accordance with these rules, will be only for good cause shown. In each case the issue will be determined by an equitable procedure, affording protection to the rights of the individual and to the interests of the System.

6.31 An institutional head may for grave cause suspend an accused faculty member pending immediate investigation or speedy trial as hereinafter provided.
. . . .
6.33 In cases where other offenses are charged, and in all cases where the facts are in dispute, the accused faculty member will be informed in writing of the charges against him, which, on reasonable notice, will be heard by a special hearing tribunal whose membership shall be appointed by the institutional head from members of the faculty whose academic rank is at least equal to that of the accused faculty member.

*Board of Regents v. Roth*, 408 U.S. 564, 577, 92 S.Ct. 2701, 2709, 33 L.Ed.2d 548 (1971). *See Moore v. Otero*, 557 F.2d 435, 437 (5th Cir. 1977) (we look to state law for the existence of a property interest).

Employment as a university faculty member when accompanied by regulations prohibiting discharge except for good cause and under certain procedures gives rise to a property interest. *Board of Regents v. Roth*, 408 U.S. at 567, 92 S.Ct. at 2704. Possession of medical staff privileges, under certain circumstances, may also constitute such a property interest. *Northeast Georgia Medical Radiological Assoc. v. Tidwell*, 670 F.2d at 507, 510–511 (5th Cir. 1982); *Klinge v. Lutheran Charities Ass'n of St. Louis*, 523 F.2d 56 (8th Cir. 1975); *Christhlif v. Annapolis Emergency Hospital Ass'n, Inc.*, 496 F.2d 174 (4th Cir. 1974); *Woodbury v. McKennon*, 447 F.2d 839 (5th Cir. 1971); *Meredith v. Allen County War Memorial Hospital*, 397 F.2d 33 (6th Cir. 1968). Daly does not allege facts, however, to show that the removal of his clinical privileges in any way affects his tenure, nor does he allege right to termination of the clinical privileges only for good cause and only after compliance with certain procedures established by the Board of Regents or the Medical School bylaws or any written contract or any state custom or mutual understanding. Ultimately, Daly has alleged no facts to show "the existence of rules or mutually explicit understandings," *Perry v. Sinderman*, 408 U.S. 593, 601, 92 S.Ct. 2694, 2699, 33 L.Ed.2d 570 (1972), that create a property interest in these privileges.

Where medical staff privileges have been held to constitute an interest protected by the fourteenth amendment, it has been because there was an explicit or implicit agreement providing for no termination of the privileges without cause and a hearing, *Northeast Georgia Radiological Assoc. v. Tidwell*, 670 F.2d at 510–511, or because denial of staff privileges "might effectively foreclose ... practicing in the area because of harm to [a] professional reputation and because of the lack of other [comparable] facilities," *Christhlif v. Annapolis Emergency Hospital Ass'n, Inc.*, 496 F.2d at 178. Daly provides no facts to show that his clinical privileges would be analogous to medical staff privileges, that there was any explicit or implicit written or oral agreement or understanding which created an entitlement to these privileges, or that the removal of his clinical privileges actually totally foreclosed his ability to practice. We do not intimate that clinical privileges could not rise to the level of a constitutionally protected property interest; we only say that, in this case, Daly did not meet his burden of presenting facts to show that a property interest existed. A doctor has no constitutional right to practice medicine at a public hospital, *Hayman v. Galveston*, 273 U.S. 414, 47 S.Ct. 363, 71 L.Ed. 714 (1927); we hold that, absent any facts to establish the nature of Daly's clinical privileges as they related to his tenure or to a contract with the Medical School or to *any* written or oral agreement with the Medical School, Daly has shown no property interest in those clinical privileges.

Likewise, Daly did not demonstrate the existence of a liberty interest in his claim that the removal of his clinical privileges damaged his reputation. *Paul v. Davis*, 424 U.S. 693, 711–12, 96 S.Ct. 1155, 1165, 47 L.Ed.2d 405 (1976); *Moore v. Otero*, 557 F.2d at 437. As this court has articulated:

> In *Paul v. Davis*, 424 U.S. 693, 96 S.Ct. 1155, 47 L.Ed.2d 405 (1976), the Supreme Court ruled that defamation by a state official alone did not deprive an individual of a liberty interest protected under the due process clause of the fourteenth amendment so as to give rise to a 42 U.S.C. § 1983 action. *To establish a liberty interest sufficient to implicate fourteenth amendment safeguards, the individual must be not only stigmatized but also stigmatized in connection with a denial of a right or status previously recognized under state law. See Paul, supra* at 711–12, 96 S.Ct. 1155 [at 1165].

*Moore v. Otero*, 557 F.2d at 437 (emphasis added). Under this "stigma-plus" test, *id.*,

assuming that the loss of clinical privileges stigmatized Daly, his retention of his tenured professorship absent any showing that he had an entitlement to the clinical privileges negates his claim that he was denied "liberty." While some actions could be so devastating as to amount to a "loss of employment" and implicate a liberty interest, *id.* at 438, Daly simply did not allege facts to show that such a drastic change in status occurred in his situation. His privileges were removed after he indicated he would be unavailable; he did not, however, suffer loss of employment; he was still a tenured professor; on his return from voluntary leave his privileges were quickly restored. Any alleged damage to reputation because Daly could not see patients or because he would be forced to reveal the temporary loss of privileges does not implicate a liberty interest.[13]

## V. FIRST AMENDMENT VIOLATION

Daly has also alleged a deprivation of his first amendment rights of speech and association. He alleged Sprague forbade him to communicate with patients and that he was unable to participate in a consultation with another physician because of the removal of his clinical privileges.

The district court described Daly's assertion that he was forbidden to communicate with patients as an allegation of deprivation of liberty, that is, that his reputation was damaged because he could not practice

his profession. As explained in part IV, *supra*, we agree that there was no liberty interest implicated in the removal of the clinical privileges and the resulting inability, if any, to see patients.

Daly's allegations, however, raise first amendment concerns which are not dependent upon the existence of a liberty or property interest. *Perry v. Sinderman*, 408 U.S. at 596, 92 S.Ct. at 2696. Daly alleges that his first amendment rights of speech and association were infringed by the removal of his clinical privileges. This particular claim is not that Daly's clinical privileges were removed *because* of his exercise of a protected first amendment activity,[14] *id.*, but that protected first amendment activities were impermissibly infringed because of Sprague's prohibition of any communication with his patients. *See Broadrick v. Oklahoma*, 413 U.S. 601, 93 S.Ct. 2908, 37 L.Ed.2d 830 (1973) (state could restrict employee participation in political activity).

This first amendment question is not whether Daly may be disciplined because of his speech, but whether, in the course of the removal of his clinical privileges, his rights to communicate and associate with patients could be limited. Daly alleges that they could not be so limited. He also alleges facts to support the existence of this legal question. He alleges in his pleadings, affidavits and briefs that he was told by Dr. Sprague that he could not communicate

13. Daly relies on *Goss v. Lopez, supra*, to support his allegation of deprivation of a liberty interest. In *Goss*, students who were required by Ohio state law to attend school were subjected to disciplinary suspensions of ten days without benefit of any due process hearing. Such suspensions were held to be deprivations of the students' liberty interests in reputation and future employment. Daly argues that the removal of his privileges damages his reputation and prospects for future employment and is analogous to the suspensions in *Goss.* We disagree. In *Goss* the students possessed a protected fourteenth amendment entitlement to attend school and deprivation of this right could not be effected without due process. Here, however, when there is no loss of employment or showing of the possibility of foreclosure from future employment no *Goss* liberty interest is implicated.

This conclusion is quite consistent with our most recent holding in this area, *Goss v. Lopez*, 419 U.S. 565 [95 S.Ct. 729, 42 L.Ed.2d 725] (1975), that suspension from school based upon charges of misconduct could trigger the procedural guarantees of the Fourteenth Amendment. While the Court noted that charges of misconduct could seriously damage the student's reputation, *id.* at 574-575 [95 S.Ct. at 736], it also took care to point out that Ohio law conferred a right upon all children to attend school, and that the act of the school officials suspending the student there involved resulted in a denial or deprivation of that right.
*Paul v. Davis*, 424 U.S. at 710, 96 S.Ct. at 1164.

14. This claim differs from Daly's claim that his privileges were removed because he challenged the MSRDP accounting practices. See part II, *supra*.

with patients and that, as a result, he was unable to participate in a consultation with another physician relating to a seriously ill patient. For example, in his Answer to Motion for Summary Judgment he states:

> Once Plaintiff returned from being in attendance during the illness of his wife, he should have been permitted to see his patients, and Defendants' failure to allow him to do so most certainly compounded whatever needs were then being experienced by Plaintiff's patients. This was a denial of Plaintiff's rights of free speech and a deprivation of a liberty interest as protected by the U. S. Constitution.

■ The Defendants did not negate, in their pleadings, affidavits or briefs, the factual and legal issues raised by these first amendment claims; they did not even address them in the Motion for Summary Judgment.[15] Our review of the district court's Order granting summary judgment indicates that it failed to analyze Daly's factual allegations of this infringement of his first amendment rights of speech and association or to determine if summary judgment was proper as a matter of law. *See Impossible Electronic Techniques,* 669 F.2d 1026 at 1030. Thus, because the Defendants wholly failed to address the legal or factual questions, they failed to carry their dual burden of demonstrating that there was no genuine issue as to any material fact and that they were entitled to summary judgment as a matter of law, *id.,* the granting of the motion for summary judgment was inappropriate. We decline, from this record, to address these issues prior to consideration by the district court. We remand the case for appropriate supplemental briefing and discovery, if necessary, and consideration of Daly's first amendment claim. We intimate no view as to the merits of Daly's claim.

## VI. OTHER CLAIMS

Daly alleges error in the district court's noting in a footnote but not deciding that his damage claim was barred by the Eleventh Amendment.[16] The court based its opinion on the rationale that the individual defendants were sued only in their official capacities. We decline to address Daly's allegation of error at this time. Should, on remand, there be a subsequent finding that Daly's action survives the Motion for Summary Judgment, the district court should decide the issue in the first instance. In that event, our decision in *United Carolina Bank v. Stephen F. Austin State University,* 665 F.2d 553 (5th Cir. 1982) (discussing the applicability of the Eleventh Amendment to individual university officials in Texas), may be useful in the court's analysis of the liability of Defendants Rosenberg, Sprague and Bonte.

■ Additionally, Daly claims the district court erred in its determination that the members of the Board of Regents could not be subjected to liability in this § 1983 action. The court held there was no showing that "these defendants either took part in the decisions which are alleged to have violated plaintiff's rights, or that they in any way knew of the decisions." We agree. This statement correctly applies the applicable law. Daly stated only that the Regents failed to develop a policy relating to removal of clinical privileges and that his clinical privileges were subsequently removed. He wholly omitted any allegation

---

**15.** The only rebuttal stated by Defendants in relation to Daly's allegations of the violation of his first amendment rights was a footnote in their brief on appeal:

> In his Brief, Appellant has also alleged a claim (not previously examined in detail in Appellant's Original Complaint) that his right of free speech under the First Amendment was violated because (1) he was told by Appellee Sprague that he could not communicate with patients, .... [This contention] must fall before Appellant's utter failure to

point to any specific *facts* which support[s] this allegation.

**16.** The court stated:

> In addition, the Court notes without deciding that plaintiff's claim against defendants appears to be against them only in their official capacity, and would, therefore, be barred under the Eleventh Amendment at least as to the damage portion of his claim. *See Edelman v. Jordan,* 415 U.S. 651 [94 S.Ct. 1347, 39 L.Ed.2d 662] (1974).

or facts from which even an inference could be drawn that the absence of a policy in any way caused the allegedly impermissible removal of his clinical privileges.

It is axiomatic that a plaintiff cannot succeed in a § 1983 action if he fails to demonstrate a causal connection between the state official's alleged wrongful action and his deprivation of life, liberty, or property. *See Parratt v. Taylor*, 451 U.S. 527, 537, n.3, 101 S.Ct. 1908, 1913 n.3, 68 L.Ed.2d 420 (1981) (Supreme Court would assume necessary finding of causal connection between alleged negligence and deprivation of property); *Douthit v. Jones*, 641 F.2d 345 (5th Cir. 1981); *Henzel v. Gerstein*, 608 F.2d 654 (5th Cir. 1979) (in § 1983 action, causal connection must be shown between act of supervisory official and deprivation, either by evidence of direct participation or otherwise); *cf. Martinez v. California*, 444 U.S. 277, 285, 100 S.Ct. 553, 559, 62 L.Ed.2d 481 (1980) (connection was too tenuous between act of parole board and actions by released convict to constitute unconstitutional deprivation of life).

*Reimer v. Smith*, 663 F.2d 1316, 1322 n.4 (5th Cir. 1981). The judgment of the district court as to the Board of Regents and individual Regents is affirmed.

■ Finally, Daly complains that the district court heard the Defendants' Motion for Summary Judgment less than ten days after the filing of the Amended Motion. The Motion for Summary Judgment was originally filed on August 29, 1980, and included several exhibits and affidavits. Daly answered the Motion on September 22, 1980, filing a brief, his own affidavit and several exhibits, including pertinent letters exchanged with Rosenberg. On September 29, 1980, the district court extended time for discovery and reserved its ruling on the Motion for Summary Judgment. An Amended Motion for Summary Judgment was filed on February 3, 1981. An oral hearing was held on February 9, 1981. Daly was given extra time to file a supplemental answer and did so on February 11, 1981. On February 17, 1981, Defendants filed a Response to Plaintiff's Supplemental Answer to the Amended Motion for Summary Judgment. On March 2, 1981, Daly filed a Second Supplemental Answer to the Motion for Summary Judgment. The court granted the Motion for Summary Judgment on April 30, 1981.

Daly, within the meaning of *Kibort v. Hampton*, 538 F.2d 90 (5th Cir. 1976), had more than ten days' advance notice of the court's ruling on the motion and more than ten days in which to be heard, that is, to file appropriate pleadings and affidavits.

> What the rule contemplates is 10 day[s] advance notice to the adverse party that the matter will be heard and taken under advisement as of a certain date. *This provides the adverse party with an opportunity to prepare and submit affidavits, memoranda and other materials for the court to consider when ruling on the motion. If the adverse party is given this opportunity, then he has been heard within the meaning of Rule 56.*

*Id.* at 91 (emphasis added). *See Village Harbor, Inc. v. United States*, 559 F.2d 247 (5th Cir. 1977) ("Plaintiffs had over two months to respond to the summary judgment motion;" there was no violation of Fed.R.Civ.P. 56(c).).

Daly had more than ten days to submit pleadings and affidavits before the district court, on September 29, 1980, extended discovery and reserved judgment on the Motion for Summary Judgment. Additionally, after the Motion was reurged, Daly was heard at an oral hearing and filed two more pleadings citing additional legal authority and pertinent deposition excerpts prior to the court's ruling, three and one-half months later, on April 30, 1981.

The judgment of the district court is reversed insofar as summary judgment was granted without consideration of Daly's allegations of violation of his first amendment rights. The case is remanded for any necessary supplemental briefing as to the legal issues and discovery as to the factual issues relating to this first amendment claim.

Defendants shall bear the cost of this appeal.

AFFIRMED IN PART, REVERSED IN PART and REMANDED WITH INSTRUCTIONS.